# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION

| | |
|---|---|
| WEST LIBERTY FOODS, L.L.C.,<br><br>Plaintiff,<br><br>v.<br><br>MORONI FEED COMPANY,<br><br>Defendant. | Case No. 4:10-cv-00146-JEG-TJS<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR CONFIRMATION OF ARBITRATION AWARD** |

Pursuant to LR 7 and 9 U.S.C. § 9, Defendant Moroni Feed Company ("MFC") respectfully submits this Memorandum in Support of Defendant's Motion for Confirmation of Arbitration Award, wherein MFC has asked the Court for an order confirming the Final Award issued by the American Arbitration Association ("AAA") Panel of Arbitrators on August 15, 2013, a copy of which is attached as Exhibit A, as well as entry of a Judgment in favor of MFC and against Plaintiff West Liberty Foods, L.L.C. and Western Sales, L.L.C., the Respondents in said arbitration (collectively "WLF") in the amounts set forth below.

The "confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984); *see also Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 579 (2008) ("The Federal Arbitration Act . . . , 9 U.S.C. § 1 *et seq.*, provides for expedited judicial review to confirm, vacate, or modify arbitration award."). The Federal Arbitration Act provides specifically that "at any time within one year after the award is made any party to the arbitration may apply to the court . . . for an order confirming the award, and thereupon the court

*must* grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9 (emphasis added).  Thus, in the absence of a statutory challenge to the arbitration award, the court is required to confirm the award and enter judgment in favor of MFC.

The nature of the arbitration proceedings which resulted in the final award may be summarized as follows:

1.     On February 18, 2012, Claimant MFC filed a Demand for Arbitration with the AAA, pursuant to the parties' arbitration agreement, a copy of which is attached as Exhibit B, wherein MFC asserted various claims against WLF;

2.     On March 29, 2012, WLF filed its Answer and Counterclaim in said arbitration;

3.     On April 20, 2012, MFC filed its Reply to WLF's Counterclaim;

4.     The parties subsequently conducted discovery in this arbitration;

5.     A four-day Hearing was held in this arbitration on March 4-7, 2013, before a three member Panel of Arbitrators (the "Panel");

6.     Extensive post-hearing briefing was concluded on May 1, 2013;

7.     On June 27, 2013, the Panel issued its Interim Award, a copy of which is attached as Exhibit C, wherein the Panel:

a.     Awarded MFC $4,533,407 on its breach of contract claim, together with pre-judgment interest at the Utah statutory rate of 10% through the date of the Interim Award;

      b.      Awarded WLF $1,531,427.41 on its breach of turkey breast agreement counterclaim, together with pre-judgment interest at the maximum Iowa statutory rate through the date of the Interim Award; and

      c.      Awarded both sides post-judgment interest on their respective awards at the rates allowed under the applicable state statutes.

8.      On July 12, 2013, WLF filed an Objection to the Entry of Any Award in Favor of Moroni Feed Company that is in Addition to or Supplemental to the Interim Award Entered on June 27, 2013 ("WLF's Objection");

9.      On July 15, 2013, WLF filed a Rule 46 Request to Modify Award ("WLF's Rule 46 Request"); and

10.      On August 15, 2013, the Panel issued its Final Award, wherein the Panel:

      a.      Overruled WLF's Objection;

      b.      Denied WLF's Rule 46 Request;

      c.      Denied MFC's request for an award of expenses for responding to WLF's Objection and Rule 46 Request;

      d.      Awarded MFC $2,152,619.93 in prejudgment interest through June 27, 2013 on MFC's award of $4,533,407;[1]

---

[1] Pursuant to the direction of the Panel, as set forth in the Interim Award, the parties conferred and reached an agreement regarding the mathematical calculation of the pre-judgment interest on each side's respective award through June 27, 2013, as well as an agreement regarding the applicable post-judgment interest rate to be applied under Utah and Iowa law. This was

     e.      Awarded WLF $496,765.60 in prejudgment interest through June 27, 2013 on WLF's award of $1,531,427.41; and

     f.      Awarded MFC post-judgment interest on MFC's award at the rate of 2.15% per annum under Utah law, and awarded WLF post-judgment interest on WLF's award at the rate of 2.12% per annum under Iowa law.

*See* Exhibit A.

Based on the foregoing, MFC was awarded a total of $6,686,026.93 against WLF through the date of June 27, 2013, while WLF was awarded a total of $2,028,193.01 against MFC through the date of June 27, 2013. Therefore, the net amount owed by WLF to MFC as of June 27, 2013 was $4,657,833.92.

The daily post-judgment interest on MFC's award is $393.83 (which amount is calculated as follows: $6,686,026.93 x .0215 = $143,749.58 / 365 days = $393.83). The daily post-judgment interest on WLF's award is $117.80 (which amount is calculated as follows: $2,028,193.01 x .0212 = $42,997.69 / 365 days = $117.80). Therefore, the net daily post-judgment interest rate owed by WLF to MFC is $276.03 (which amount is calculated as follows: $393.83 - $117.80 = $276.03).

Based on the foregoing, MFC respectfully requests that the Court enter an order confirming the Panel's August 15, 2013 Final Award in the subject arbitration, and that the Court enter Judgment herein in favor of MFC and against WLF in the net amount of $4,657,833.92 as of the date of June 27, 2013, with a post-judgment interest thereafter at the rate of $276.03 per

---

communicated via an email to the Panel on July 12, 2013, a copy of which is attached as Exhibit D.

day.

DATED this 27th day of August, 2013.

BRADSHAW, FOWLER, PROCTER & FAIRGRAVE, P.C.

By:___/s/Thomas J. Joensen_____
Thomas J. Joensen (AT0003836)
801 Grand Avenue, Suite 3700
Des Moines, IA 5039-8004
Phone: (515) 243-4191
Fax:  (515) 246-5808
E-Mail:  joensen.thomas@bradshawlaw.com

and

PRESTON & SCOTT

By:___/s/Stanley J. Preston_____
Stanley J. Preston (4119) ), *admitted pro hac vice*
Five Gateway Office Center
178 S. Rio Grande St., Suite 250
Salt Lake City, UT  84101
Telephone: (801) 869-1620
Facsimile: (801) 869-1621
E-Mail: sjp@prestonandscott.com

**ATTORNEYS FOR DEFENDANT**

Copy to:

David A. Tank
Angela Dralle
**DORSEY & WHITNEY LLP**
801 Grand Avenue, Suite 4100
Des Moines, Iowa 50309-2790
Email: tank.dave@dorsey.com
Email: Dralle.Angela@dorsey.com

CERTIFICATE OF SERVICE
The undersigned certifies that the foregoing instrument was
served upon all parties to the above cause to each of the attorneys
of record herein at their respective addresses disclosed on the
pleadings on___August 27_____ 20 13
By: ☐ Overnight Courier  ☐ FAX       ☐ E mailed
    ☐ Hand Delivered      ☐ U.S. Mail ☑ Other
    ☐ Certified Mail      ☐ Scanned   CM-ECF
Signature ___Peggy Rosby_____

5

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 58 467 Y 00030 12
    Moroni Feed Company (MFC)
    and
    West Liberty Foods, L.L.C.; Western Sales, L.L.C. (WLF)

### FINAL AWARD OF ARBITRATORS

We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated May 1, 2006, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered an Interim Award and Dissent dated June 27, 2013, which are incorporated herein by reference, do hereby, AWARD, as follows:

WLF's objection to the entry of a final award is OVERRULED.

WLF's request to modify the Interim Award pursuant to Rule 46 is DENIED.

MFC's request for an award of expenses for responding to WLF's objection and request is DENIED.

Pursuant to the agreement of the parties as directed by the panel in the Interim Award, the parties submitted the following agreed upon calculations of interest:

The amount of interest on MFC's award of $4,533,407, calculated at 10% per year equals $2,152,619.93 as of June 27, 2013, the date of the Interim Award;

The amount of interest on WLF's award of $1,531,427.41, calculated at 5% per year equals $496,765.60 as of June 27, 2013, the date of the Interim Award.

The parties further agreed that the post-judgment interest rate is 2.15% under Utah law and 2.12% under Iowa law.

As provided in the Interim Award dissent, Arbitrator Brandt would not make an award in favor of WLF.

The administrative fees and expenses of the American Arbitration Association totaling $25,650.00, shall be borne as incurred. The compensation and expenses of the arbitrators totaling $112,477.42, shall be borne equally.

The above sums are to be paid on or before thirty days from the date of this Award.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

{ADR\001760\00145492.DOC V1 }



EXHIBIT

A

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

8-12-13
_____
Date

_____
Date

_____
Date

_____
Hon. Kathleen A. Blatz

_____
Hon. Robert S. Brandt

_____
Hon. Dale A. Crawford

{ADRS\01760\00145492.DOC V3 }

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

| | |
|---|---|
| _____ | _____ |
| Date | Hon. Kathleen A. Blatz |
| _Aug. 12, 2013_ | _[signature]_ |
| Date | Hon. Robert S. Brandt |
| | |
| _____ | _____ |
| Date | Hon. Dale A. Crawford |

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____                          _____
        Date                                            Hon. Kathleen A. Blatz

_____                          _____
        Date                                            Hon. Robert S. Brandt

_____                          _____
        Date                                            Hon. Dale A. Crawford

MARKETING AGREEMENT

     THIS MARKETING AGREEMENT (hereinafter referred to as "Agreement") is made and executed in Midvale, Utah, this 1st day of May, 2006, by and between WESTERN SALES, L.L.C., an Iowa limited liability company, with its principal place of business located in West Liberty, Iowa, hereinafter referred to as "Western Sales", and MORONI FEED COMPANY, a cooperative corporation organized and existing under the laws of the State of Utah, with its principal place of business located at Moroni, Utah, hereinafter referred to as "Moroni".

WITNESSETH:

     In consideration of the mutual covenants and obligations contained herein, including but not limited to access to Western Sales customers, sales, marketing and processing expertise and Western Sales' opportunity to have access to solicit customers of Norbest, Inc. ("Norbest"), it is agreed by the parties hereto as follows:

     1.   <u>EXCLUSIVE AGENT TO MARKET</u>.  Moroni hereby appoints and designates Western Sales as its exclusive agent in the sale and marketing of all turkeys and turkey products, in any form, and other poultry and meats and the products thereof, hereinafter called "Products", processed in any way (whether slaughtered or procured from third parties) by Moroni and poultry products produced by any of Moroni's patrons, members and/or other growers or suppliers, hereinafter referred to as "Growers", for them or for any other party, except that grown for consumption by the individual Growers and that sold in Moroni's own stores.

     Western Sales hereby agrees to use commercially reasonable efforts to market Products of Moroni and is hereby granted sole discretion to solicit, accept and/or reject its customer's orders. Western Sales may employ all such persons and agencies as it may deem necessary in carrying out its obligations under the terms of this Agreement. Western Sales shall determine the prices and procedures used to market the respective Products in conjunction with Moroni's marketing representatives. Moroni hereby agrees to cooperate with Western Sales in all aspects of its strategic planning, and acknowledges that any information furnished by Western Sales with respect to strategic planning is in the nature of estimates and projections and is not to be construed as a guarantee by Western Sales of future events or conditions, nor does it constitute an assurance that Western Sales will be able to market specified turkey products at specified prices within specified time frames.

     Western Sales agrees to use commercially reasonable efforts to stimulate the demand for the Products and to cooperate with others to improve the markets for the Products.

     In order to monitor the business of Western Sales, Western Sales agrees that at all times during the term of this Agreement, a representative of Moroni may attend all regular sessions (but not executive sessions) of the board of manager meetings and



EXHIBIT

B

1

WL 51

member meetings of Western Sales and of its affiliated company, West Liberty Foods, L.L.C., but said representative shall not have any voting rights at the meetings. A representative of Moroni shall also sit on monthly Western Sales sales meetings. Moroni shall be consulted by Western Sales on all matters regarding product mix, product development and customer profiling. Western Sales shall regularly report to Moroni on all sales of Products by Western Sales.

As the exclusive marketing agent for Moroni, Western Sales shall provide to Moroni at Western Sales' cost the services listed on the Exhibit "A" attached hereto and made a part hereof by this reference.

2.      DELIVERY OF PRODUCTS.    Moroni agrees to deliver to Western Sales or to customers of Western Sales or to other locations at such time or times and such place or places as Western Sales may direct, the Products of Moroni in good marketable condition, which Products shall be free and clear of all liens and encumbrances, including those provided by the Packers and Stockyards Act, as more fully discussed hereafter in Section 15, and those provided by any state agricultural lien laws. Western Sales agrees to use due care and diligence in the handling and marketing of said Products.

3.      TRANSFER OF TITLE. Title to Products processed by Moroni and risk of loss with respect to the Products shall remain in Moroni until said Products arrive at the dock of a customer of Western Sales, or at such other places as directed by Western Sales, at which time title and risk of loss shall pass through Western Sales to the customer. Moroni shall insure that it has good, free and clear title to the Products at the time of delivery to Western Sales' customer's docks or at such other location as directed by Western Sales, and that the Products are free of any claims of Growers or others. Where delivery of Products to Western Sales' customers cannot be completed due to unforeseen circumstances, title to Products will remain in Moroni until delivery to the customers. As long as Moroni retains title to the Products, Moroni shall insure the Products for fire and other hazards and pay all taxes, freight and storage charges relating thereto.

4.      AUTHORIZATION TO SELL; MARKETING FEES.    Moroni hereby authorizes Western Sales to sell Products in Western Sales' own name, brands and labels or in such other names, brands and labels that Western Sales is authorized to use and to pass title to said Products to the customer, at such time or times, at such place or places, and in such manner as determined by Western Sales and its customers. Each week, Western Sales agrees to remit to Moroni the amount of the invoiced plant sales price of sales from the week prior to the week in which payment is made, after deducting the following offsets:

A.      Agreed upon marketing fees;
B.      Any applicable freight, storage, handling, and delivery charges;
C.      Any damages incurred by Western Sales arising out of the sale of any Products, including but not limited to recall damages and costs, interest charges and reasonable attorney's fees;
D.      Sales adjustments and other deductions due to quality deficiencies and other problems;

2

E.   Any charges for product liability or inventory hazard insurance premiums assessed to Moroni applicable to its Products;

F.   Any Moroni-authorized expenses incurred by Western Sales with respect to a specific order or sale for Nebraska by Western Sales; and

G.   Any other amounts due Western Sales from Moroni hereunder.

The parties agree that the marketing fees to be charged by Western Sales to Moroni are set forth in Exhibit "B" attached here to and made a part hereof by this reference. Moroni acknowledges that Western Sales has relied on books, records, and other information ("Due Diligence Information") provided by Moroni and Norbest in agreeing to the amounts of the marketing fees set forth in Exhibit "B." Accordingly, in the event that, following the effective date of this Agreement, Western Sales discovers costs incurred by Moroni or Norbest in connection with marketing the Products, prior to the effective date, that were not discovered in the Due Diligence Information, then Western Sales shall have the right to adjust the marketing fees, on a retroactive basis, to fairly compensate Western Sales for such undisclosed costs, in an amount such that the marketing fee percentages due Western Sales hereunder during the term of this Agreement do not exceed the budgeted marketing fee percentages projected to be due Norbest as per its 2006 budget. The adjusted marketing fee percentages shall apply throughout the term of the Agreement.

5.   <u>MORONI SALE RIGHTS</u>. Western Sales may authorize Moroni to sell Products of Moroni under Western Sales' control and supervision and subject to Western Sales' marketing fee at such times and places, at such price or prices and in such manner and under such labeling as Western Sales may from time to time in its sole discretion determine. Products donated or sold to charities, gifted or sold to employees or to Growers, or sold at Moroni's company stores shall not be subject to the above restrictions and marketing fees. Notwithstanding anything herein to the contrary, no sales by Moroni shall compete with usual Western Sales marketing programs.

6.   <u>RAW MATERIAL CONTRACT</u>. Moroni shall not be required to pay a marketing fee with respect to the sale to Western Sales or West Liberty Foods, L.L.C. of raw materials or the sale of any other products to be used or utilized by Western Sales on its own account.

7.   <u>CONTINUING FOOD GUARANTEE</u>. Any Products , including poults and other live turkeys whether procured from within or outside Moroni's system, are guaranteed by Moroni at all times to be not adulterated, misbranded or unwholesome within the meaning of the Poultry Products Inspection Act, as amended by the Wholesome Poultry Products Act, and/or the Federal Food, Drug and Cosmetic Act, as amended, and not articles which may not be introduced into interstate commerce nor articles adulterated or misbranded under applicable provisions of any federal, state or municipal law. Moroni also guarantees that all Products are in full compliance with United States Department of Agriculture (USDA) and Western Sales specifications and standards. Moroni undertakes and agrees that it will defend, protect, save and keep Western Sales forever harmless and indemnified against and from any penalty assessed, damages incurred, or charges imposed, and any and all claims, losses, costs, damages, expenses or attorney's fees

WL 53

arising out of any failure of Moroni in any respect to comply with and perform this guarantee, including without limitation any damages or losses of any kind suffered by Western Sales as a result of any Products recall.

8.    <u>PROCESSING, QUALITY ASSURANCE</u>. Moroni agrees to process Products in accordance with USDA and Western Sales standards and specifications, including but not limited to quality assurance standards and specifications, and acknowledges that it is fully responsible for compliance with said standards and specifications and for the quality of its Products. From time to time, Western Sales may require quality assurance inspections by an independent outside company, which notwithstanding the terms of Exhibit A shall be at Moroni's expense, and all requests and observations of such outside company shall be detailed in writing and forwarded to Moroni. Moroni agrees to implement any applicable quality assurance programs as developed or amended from time to time by Western Sales or such outside company, submit weekly monitoring reports, allow facility audits, and comply with all recommendations therefrom. Moroni further agrees that the Western Sales or outside company quality assurance programs and facility audit programs do not relieve Moroni of its responsibility for quality assurance. Moroni further agrees to provide its own trained quality assurance personnel who are responsible to verify full compliance with USDA and Western Sales specifications and standards.

Moroni acknowledges and agrees that, if Moroni's plants do not meet acceptable USDA processing quality standards and Western Sales product specifications, Western Sales may issue product hold orders or cease and desist orders, which may include, among other remedies, an order prohibiting the packaging of Products in Western Sales bags and/or labels. Such quality-related cease and desist orders shall be issued only after Western Sales and Moroni management are made aware of any violation. The Western Sales cease and desist order will be lifted when all causes leading to the violation have been completely corrected. Moroni agrees to conform its Products and packaging to any uniform specifications as may from time to time be requested by Western Sales.

9.    <u>RESIDUES</u>. Moroni hereby agrees to carry out the procedures required by any applicable drug and chemical residue avoidance programs for all Products as requested by Western Sales.

10.    <u>ENVIRONMENTAL ASSURANCE</u>. After reasonable inquiry and to the best of Moroni's knowledge and belief, no property owned or leased by it or any operations by it, including without limitation its turkey processing plant(s), are in material violation of any federal, state or local law, ordinance or regulation, including but not limited to those relating to the protection of the environment. Moroni agrees to immediately notify Western Sales of any change in the environmental status of its property from reports submitted to Western Sales.

11.    <u>SAFETY</u>. Moroni agrees to appoint and maintain a safety coordinator to achieve, monitor, train, record and otherwise be responsible for a functional safety program, and to join the National Safety Council. Moroni further agrees to adhere to all

4

WL 54

applicable local, state and federal and OSHA safety laws, rules and regulations, and to develop and maintain an active safety program which will ensure a safe working environment for its employees.

      12.   DRUG-FREE WORKPLACE.  Because Western Sales may contract with United States government and other governmental entities, the parties hereto agree to comply with the requirements of the Drug-free Workplace Act of 1988 (P.L.100-690), and to ensure that their respective work places are free of drugs as defined in said act.  The parties agree to establish drug-free awareness programs and to circulate them to employees and regularly train their employees with respect to drug problems.

      13.   EQUAL EMPLOYMENT OPPORTUNITY COMPLIANCE.  During the term of this Agreement, neither party shall discriminate against any employee or applicant for employment based on race, color, religion, sex, age, national origin or disability as outlined in the nondiscrimination provisions of Section 202, Executive Order #11246, as amended, the Age Discrimination and Employment act of 1967, as amended, the Rehabilitation Act in 1973, as amended, and the Americans with Disabilities Act of 1990.  Moroni shall, while this Agreement is in effect, conduct all of its affairs so as to comply with all state and federal statutes and regulations concerning equal employment opportunities.

      Moroni hereby certifies that it does not and will not maintain or provide for its employees any segregated facility at any of its establishments, and does not and will not permit its employees to perform its services at any location under its control where segregated facilities are maintained.  The term "segregated facilities" means any waiting rooms, work areas, rest rooms, and wash rooms, restaurant and other eating places, time clocks, locker rooms, and other storage or dressing areas, parking lots, drinking fountains, recreational or entertainment areas, transportation and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local customs or otherwise.

      Moroni acknowledges familiarity by its officials with Title VII of the Civil Rights Act of 1964 and Executive Order #11246, together with all applicable rules and regulations of the Equal Employment Opportunity Commission and the office of Federal Contract and Compliance, and it is in compliance with such requirements as they pertain to government contractors, subcontractors and suppliers to contractors and subcontractors.  Moroni will obtain certifications from suppliers prior to making purchases exceeding ten thousand dollars ($10,000.00) which are not exempt from the provisions of equal employment opportunity clause provisions of Executive Order #11246.

      14.   CONFIDENTIALITY.  The parties hereto agree that any proprietary information and trade secrets learned as a result of any relationship created by this Agreement will be held in strictest confidence and will not be discussed or released to any other person or persons without the prior written consent of the other party.  The parties acknowledge that those trade secrets protected by this Agreement include but are not limited to Products formulae, processing procedures, customer lists, customer contact information, price lists, and marketing strategies, and financial information.  This obligation

WL 55

of confidentiality shall continue for a period of five (5) years after the date of termination of this Agreement.

15.    PACKERS AND STOCKYARDS ACT AND STATE LIEN WAIVER. In order to obtain access to Western Sales customers and marketing abilities, Moroni agrees to include in each agreement between itself and its Growers and/or other suppliers of turkeys or turkey products a waiver of rights and/or an acknowledgement of a credit sale under the Packers and Stockyards Act, 1921, as amended (U.S.C. §181, et seq.; hereinafter the "Act"), and under state agricultural lien laws. The waiver shall state that the Growers, as between themselves and Western Sales, acknowledge that they are not within the class of persons protected by or entitled to receive the benefits of the Act or of state agricultural lien laws, that the Growers are not "cash sellers" as said terms are defined in the Act, that the Growers, with full knowledge of the provisions and rights under the Act and other lien laws, waive all rights whatsoever they may have at any time under the Act and other lien laws against Western Sales, and that the waiver is in consideration of Moroni having access to Western Sales marketing services, and shall be substantially in the form of the waiver agreement and/or acknowledgement of credit sale attached hereto as Exhibit "C" and made a part hereto by this reference.

Moroni hereby waives all rights whatsoever it may have at any time under the Act and agricultural lien laws against Western Sales, acknowledges that it is not within the class of persons protected by or entitled to receive benefits of the Act or lien laws, and indemnifies, holds harmless, and agrees to defend Western Sales from and against all claims, damages, expenses (including, without limitation, attorney's fees and reasonable investigative and discovery costs), liabilities and judgments on the account of any claim or demand upon Western Sales under or relating to the Act or any state agricultural lien laws.

In the event that Moroni becomes a co-insured under the products liability insurance policy of Western Sales, then (1) said coverage as applicable to Moroni shall be only with respect to Products to which title passes to Western Sales under the terms of this Agreement; (2) Moroni shall bear the cost of any additional premiums payable for such policy by virtue of Moroni becoming a co-insured under the policy; (3) Moroni shall bear the cost of any increase in premiums payable for such policy resulting from claims paid on the policy as a result of the actual or alleged negligent acts or omissions of Moroni; and (4) said policy shall provide for a waiver of subrogation by the insurer as to claims against either Western Sales or Moroni or their respective members, shareholders, managers, directors, officers, employees, or other agents. In addition, Western Sales and Moroni each waive all rights against each other and any of their respective members, shareholders, managers, directors, officers, employees, or other agents for damages caused by loss to the extent covered by a products liability insurance policy described in this paragraph.

16.    REMEDIES. Any loss to Western Sales, including but not limited to all expenses, court costs and attorney fees, incidental and consequential damages and any other damages of any kind, including loss of goodwill by Western Sales, for any inferior quality, deterioration, unwholesomeness, adulteration, unfitness for human consumption, quarantine or seizure by any governmental agency because of disease, unwholesomeness,

WL 56

adulteration, pesticides, residues, or any other reason, including but not limited to recalls or Product withdrawals, failure to deliver Products in a timely manner, or any other breaches of this Agreement by Moroni, shall be fully borne by Moroni. Without limiting the generality of the foregoing, Moroni shall defend, indemnify, and hold Western Sales harmless from and against any and all claims howsoever arising, whether sounding in tort, contract, warranty, or otherwise and all reasonable expenses, including without limitation, attorney's fees and court costs, resulting from any injury to or death of any person, any damage to property, or any other loss caused by a defect in the Products; the acts or omissions of Moroni or its agent in respect of its obligations under this Agreement; the failure of the Products to comply with any applicable specifications; the breach of any agreement, representation, or warranty of Moroni under this Agreement; or any other act or omission of Moroni or its agent. Moroni's obligations hereunder shall survive termination of this Agreement.

In case of Moroni's breach of this Agreement and in addition to any other remedies contained herein, Western Sales is also entitled to any of the remedies available to an aggrieved buyer of goods set forth in §70A-2-711, et seq., Utah Code Annotated (1953, as amended), including but not limited to cover damages and costs, damages for non-delivery, damages for delivering defective Products not in conformity to United States Department of Agriculture and/or Western Sales standards and specifications, incidental and consequential damages, and rights of offset and lien rights against products.

17.   ARBITRATION; COSTS AND ATTORNEY'S FEES. In the event that either party claims that the other party has breached this Agreement in any way and the parties cannot resolve the dispute through negotiations, they shall attempt to resolve the dispute through the assistance of a neutral third-party mediator.

If the dispute is not resolved by use of a mediator, then any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The award in such arbitration shall be a reasoned award. The parties shall have the opportunity to pursue any discovery in the arbitration which they reasonably believe is necessary to arbitrate all of the claims and defenses in the arbitration.

If Western Sales brings a demand for arbitration, the arbitration shall be conducted in Salt Lake City, Utah. If Moroni brings a demand for arbitration, the arbitration shall be conducted in Des Moines, Iowa.

The arbitrator(s) may award to the prevailing party any costs and expenses arising out of or caused by the arbitration, together with a reasonable attorney's fee expended or incurred by it in such proceedings.

18.   CRISIS MANAGEMENT. Whenever Western Sales management determines that a crisis of any kind may adversely affect the Western Sales marketing integrity, Western Sales may take such action as it deems appropriate to expedite a solution

7

WL 57

and to minimize damages, financial losses, and exposure to Western Sales, and shall immediately notify Moroni of the crisis and of any actions regarding the crisis taken by Western Sales.

19.   <u>NON-ASSIGNABILITY</u>.   Except as otherwise specifically provided herein, this Agreement may not be assigned by either party without the prior written consent and approval of the other, which consent shall not be unreasonably withheld.

20.   <u>TERM</u>.   Except for guarantees regarding wholesomeness of Products, this Agreement shall supersede any agreement now in effect between the parties and shall become binding when executed by the parties.   It is agreed that this Agreement shall continue in force for a term of three (3) calendar years beginning on the effective date set forth in the first paragraph of this Agreement. This Agreement shall continue in force thereafter until canceled by either party by notice in writing to the other party.   After the initial three-year term, if Moroni desires to terminate this Agreement at any time, Moroni shall give written notice to Western Sales at least sixty (60) days prior to the effective date of termination.   After the initial three-year term, if Western Sales desires to terminate this Agreement at any time, Western Sales shall give written notice to Moroni at least one (1) year prior to the effective date of termination.

Upon termination of this Agreement for any reason, Moroni shall not thereafter use or divulge to third parties any Western Sales trade secrets or proprietary information of Western Sales, and Moroni shall immediately return to Western Sales any and all documents, records and other materials containing Western Sales proprietary information and trade secrets, including but not limited to trademarks, service marks, customer lists, price lists, Products formulae, specifications, processing procedures and techniques, financial records and sales records.

Also, upon termination of this Agreement for any reason, Western Sales shall not thereafter use or divulge to third parties any Moroni trade secrets or proprietary information of Moroni, and Western Sales shall immediately return to Moroni any and all documents, records and other materials containing Moroni proprietary information and trade secrets, including but not limited to trademarks, service marks, customer lists, price lists, Products formulae, specifications, processing procedures and techniques, financial records and sales records.

Despite termination of this Agreement at any time for any reason pursuant to this Section, the provisions herein relating to delivery of goods (Section 2), transfer of title (Section 3), authorization to sell and marketing fees (Section 4), continuing food guarantee (Section 7), processing and quality assurance (Section 8), residues (Section 9), remedies (Section 16), and costs of litigation and attorney's fees (Section 17), shall remain in full force and effect with respect to any Products packed in bags or boxes with Western Sales logos, labels, trademarks or trade names.   No packaging materials containing Western Sales logos, labels, trademarks or trade names may be disposed of in such a manner as to damage Western Sales brand names in any way.

WL 58

Upon notice of intent to terminate this Agreement at any time for any reason or by either party, any former employee of Norbest which was hired by Western Sales may be solicited by Moroni to work for Moroni or for Norbest, and Western Sales will not interfere with Norbest's ability to rehire those employees.

Also, upon termination of this Agreement at any time for any reason or by either party, Norbest and/or Moroni shall, at the option of Western Sales, assume any contracts and any marketing and promotional agreements that Norbest had in place prior to the execution of this Agreement, or any extensions of those contracts and agreements, or any other contracts or agreements for the sale of Products. Upon the assumption of such contracts and agreements, Norbest and/or Moroni shall hold Western Sales harmless with respect to such contracts and agreements. At the effective date of the termination of this Agreement, Western Sales shall provide to Moroni and/or Norbest the sales history, customers, customer contact information, and other sales information for all sales of Products during the term of this Agreement. Notwithstanding anything herein to the contrary, Norbest shall not be responsible for any liabilities, claims, suits, actions or judgments arising out of any sales of Products by Western Sales.

21.   INDEMNIFICATION. If Western Sales assumes any contracts or other promotional or sales agreements of Norbest, for the benefit of Moroni as a member of Norbest, Western Sales agrees to hold Norbest harmless and indemnify Norbest with respect to any contracts or agreements assumed by it. Western Sales hereby agrees to indemnify and hold Moroni harmless from any claims, suits, judgments, or other obligations of Western Sales which do not arise out of the sale of the Products. For the purposes of Sections 20 and 21 of this Agreement, Norbest is deemed to be a third-party beneficiary of this Agreement.

22.   NOTICE. Any notice required under this Agreement shall be addressed as follows:  to Western Sales, L.L.C., 207 West 2nd Street, West Liberty, IA  52776; to Moroni Feed Company, P. O. Box 368, Moroni, UT  84646; or to such other address as the respective parties may designate in writing.

23.   GOVERNING LAW. This Agreement shall be construed in accordance with the laws of the State of Utah.

24.   SCOPE OF AGENCY. The parties hereto are independent contractors. Nothing contained in this Agreement shall be construed to create a partnership between the parties, or to authorize either party to act as a general agent for the other party. All persons employed by a party to perform duties under this Agreement are, and shall remain, the employees and agents of such and are not, and shall not become, employees or agents of the other party.

25.   ENTIRE AGREEMENT; MODIFICATION; WAIVER. This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes any prior and contemporaneous agreements,

WL 59

representations, and understandings of the parties.  No representations by either party other than those contained herein have been relied on by the parties.

No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the parties.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first stated above.

WESTERN SALES:
WESTERN SALES, L.L.C.

By: _Ed Garrett President & CFO_
Its President

MORONI:
MORONI FEED COMPANY

By: _David Bailey_
Its President

WL 60

EXHIBIT "A"

Services to be provided to Moroni by Western Sales at Western Sales' cost:

1. Sales adjustments unless they are product quality- or trucking-related.
2. Gift certificate program facilitation.
3. Facilitation of the UPS distribution and gift certificate program.
4. Management of broker network and payment processing of related commissions.
5. Responsibility for all bad debts.
6. Dues and subscriptions necessary to maintain ongoing business.
7. Sales-related taxes such as state business and occupation taxes and state franchise taxes, but not including property taxes or income taxes.
8. Sales expenses for broker and customer visits to the office and plants.
9. Product development costs.
10. Operations and quality assurance costs.
11. Advertising and promotional program costs.
12. Crisis management.
13. Invoicing of all product shipments including administering any customer invoice adjustments.
14. Inventory management of product in outside warehouses controlled by Western Sales. This would include the processing of all applicable storage bills as well as arranging distribution.
15. Value month-end inventories for insurance purposes.
16. Computer information for sales analysis.
17. Plant communications for all applicable data transmissions.
18. Maintain EDI communications with applicable customers.
19. Monitor all product insurance claims with applicable insurance companies.
20. Coordinate and direct quality assurance activities.
21. Coordinate and direct quality standards and specifications.
22. Assist with safety activities at the plants.
23. Work with regulatory agencies and Moroni to ensure compliance with applicable laws and regulations.
24. Coordinate packaging supplies with Moroni.
25. Design new products, improve existing products, develop product formulations and specifications.
26. Submit all labels to USDA for approval.
27. Consult and advise Moroni concerning technical aspects of further processing.
28. Respond to technical product questions from sales staff, brokers, customers and consumers.
29. Evaluate competitive product samples.
30. Represent Moroni plants with trade associations.
31. Perform annual plant audits by Western Sales employees.
32. Develop sales aids and support materials.
33. Direct consumer and trade public relations activities.
34. Develop new label and packaging graphic designs.
35. Develop and implement all marketing research projects.

WL 61

36. Maintain the Norbest website.
37. Monitor file of open customer orders for Moroni.
38. Build loads for Moroni and communicate same for delivery.
39. Monitor shipments to ensure timely delivery.
40. Monitor shipments with order to compare accuracy with customer request.
41. Release orders and arrange shipments for product in outside controlled warehouses.
42. Resolve product problems for shortages, price discrepancies and shipping problems.
43. Monitor all inventories.
44. Coordinate and schedule production requirements of further processed raw and cooked products.
45. Coordinate weekly refrigerated sales with production and shipping.
46. Coordinate customer needs with Moroni's product availability.
47. Handle consumer relations by responding to inquiries and complaints and mailing gift certificates where applicable.
48. Handling and processing customer complaints.
49. Maintain continuing food guarantee and certificate of insurance files for mailing to customers as requested.
50. Manage any litigation involving Moroni product and direct outside counsel.
51. Protection and monitoring of all trademarks, including the filings and renewals with the applicable government agencies to protect all trademarks.

WL 62

EXHIBIT "B"

MARKETING FEES

Western Sales shall charge to Moroni the following marketing fees:

| Product | Marketing Fee |
|---|---|
| Hens | 2.70% |
| Toms 16/24 | 2.70% |
| Toms 24/28 | 2.70% |
| Toms 28/UP | 2.70% |
| | |
| Breasts-UN/08 | 2.70% |
| Breasts-08/14 | 2.70% |
| Breasts-14/UP | 2.70% |
| Sweatheart Roasts | 2.70% |
| Other Roasts | 2.70% |
| Smoked Turkeys | 2.70% |
| | |
| Bulk Meat | 1.75% |
| Parts | 1.75% |
| MDT/Skin/Misc | 1.75% |
| | |
| Steaks | 4.25% |
| Ground Turkey | 4.25% |
| | |
| Foodservice Breast | 5.10% |
| Foodservice Dark | 5.10% |
| Retail Breast | 2.70% |
| Retail Dark | 2.70% |
| | |
| Other Products | To Be Negotiated |

WL 63

EXHIBIT "C"

PACKERS AND STOCKYARDS ACT WAIVER

The undersigned, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, with full knowledge of its rights under the Packers & Stockyards Act, 1921, as amended (7 USC § 181 et seq.), "the Act", hereby expressly and voluntarily waives all rights whatsoever the undersigned may have under the Act against Western Sales, L.L.C., an Iowa limited liability company ("Western Sales") including but not limited to the opportunity to process at the processing plant owned by Moroni Feed Company, a Utah cooperative corporation ("Moroni"). The undersigned is fully informed that in the event the undersigned is not paid for products delivered to any processing plant, the Act may allow for the filing of a notice and the establishment of a trust covering all inventories, receivables or proceeds from the turkeys processed by the plant. The undersigned acknowledges that Western Sales and Moroni function as marketing agents and that the rights and privileges of the undersigned under the Act may jeopardize Western Sales' and Moroni's continuing as the marketing agent for the undersigned's turkeys.

This waiver is binding upon and for the benefit of the undersigned grower, its heirs, successors or assigns and Western Sales, its successors or assigns and Moroni, its successors or assigns. This Waiver shall be in full force and effect until December 31, 200 _____, and shall be automatically extended from year to year unless notice in writing is received by Western Sales at the address below not less than ninety (90) days before the end of any calendar year.

_____
Witness Name

Authorized

WESTERN SALES, L.L.C.
207 West 2nd Street
West Liberty, IA  52776

_____
Company or Grower Name

By: _____
Signature of Grower or

                    Representative

Its: _____
          Title (if applicable)

_____

_____
Address

_____
Date Signed

WL 64

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| MORONI FEED COMPANY, )<br><br>Claimant, )<br><br>v. )<br><br>WEST LIBERTY FOODS, L.L.C. AND )<br>WESTERN SALES, L.L.C. )<br><br>Respondent. ) | AAA Case 58-467-Y-000030-12 |

INTERIM AWARD

The undersigned Arbitrators, having been designated in accordance with the Arbitration Agreement entered into by the parties on May 1, 2006, and having been duly sworn, and having duly heard the proof and allegations of the parties, do hereby issue the Interim Award as follows:

## REASONED DECISION

### I. BACKGROUND

This matter was commenced on February 18, 2012, by way of a Demand for Arbitration submitted by Claimant, Moroni Feed Company (MFC or Moroni) pursuant to a referral by the United States District Court for the Southern District of Iowa.[1]  Claimant seeks damages against Respondent, West Liberty Foods (WLF or West Liberty), for an alleged violation of the Marketing Agreement (Ex. 20, the "Agreement") entered into

---

[1] Prior to the hearing, the Panel determined that the appropriate venue for the arbitration as Des Moines, Iowa.

EXHIBIT
C
tabbies

between Western Sales, now known as West Liberty Foods ("WLF") and Moroni Feed

Company.

In its Demand, MFC asserts that WLF breached the Agreement by charging

customers an upcharge (an accrual on invoices) without notifying MFC of the accruals

and without remitting to MFC the funds generated by the accruals.  MFC's claims for

relief are:

1.  Breach of Contract;

2.  Breach of Implied Covenants of Good Faith and Fair Dealing;

3.  Breach of Fiduciary Duties;

4.  Fraudulent Concealment;

5.  Conversion;

6.  Unjust Enrichment;

7.  Violation of the Utah Livestock Dealers Act;

8.  Fraud

MFC seeks compensatory damages in excess of $6,000,000 (inclusive of pre-judgment

interest) and punitive damages in the amount of $3,000,000.  MFC also seeks its

expenses and attorney's fees.

WLF denies it has breached the Agreement and filed three counterclaims, one of

which was dismissed prior to the hearing.  On its counterclaims, WLF alleges that MFC

breached the Agreement by not delivering good marketable product and by not

delivering product that complied with USDA standards and specifications.  In this

counterclaim it initially requested an amount on the claim of $150,000 to $300,000.  At

the hearing the demand on this claim was $462,671.82.  On its second remaining

counterclaim, WLF seeks damages against MFC for a violation of the Turkey Breast

Agreement (Ex. 42).  The Turkey Breast Agreement was entered into between Norbest

and WLF on August 25, 2005.  WLF claims that MFC, as the principal of its agent

Norbest, ratified the Turkey Breast Agreement and is liable for the breach of the Agreement.  WLF initially sought damages on this counterclaim against MFC in the amount of $150,000 to $300,000.  At the hearing and in its post-hearing brief WLF sought damages in the amount of $2,628,629.64, or alternatively, $1,531,427.41 if the damages are calculated on the basis of equal deliveries.  WLF also requests that costs and attorney's fees be awarded.

The arbitration was held in Des Moines, Iowa, on March 3-7, 2013.  Numerous witnesses testified in person and by way of video and written depositions.  Transcripts of other depositions were submitted to the Panel subsequent to the arbitration along with approximately 500 Exhibits.  The Agreement provides that the Award issued by the arbitrators is to be a reasoned award.  Post-hearing briefs were submitted along with subsequent post-hearing briefs regarding the Panel's jurisdiction to determine the counterclaim on the Turkey Breast Agreement which does not contain an arbitration clause.

## II.  BREACH OF CONTRACT CLAIM

A.  FINDINGS OF FACT

1.  Claimant MFC is a Utah agricultural cooperative corporation with its principal place of business in Utah;

2.  Respondent WLF is an Iowa LLC with its principal place of business in Iowa; WLF took over the assets and liabilities of its affiliate Western Sales LLC around December, 2008;

3.  Norbest, Inc. was a cooperative corporation, owned by MFC and by the Nebraska Turkey Growers Association at the time the Agreement and Turkey Breast Agreement were entered.  Norbest ceased operations in April, 2006;

4.  From November, 1992, to May, 2006, Norbest acted as the exclusive agent for MFC to sell and market turkeys and turkey products.  (See p.4, Membership Marketing Agreement, Ex. 200);

5.  The Norbest-MFC agreement provided that Norbest was authorized "to sell Products in Norbest's own name, brands and labels and to pass title to said Products to whom, at such time or times, at such place or places, and in such manner as determined by Norbest and its customers.  Norbest agrees to remit to Member the proceeds received from sales after deducting the following offsets. [Marketing Fees etc.]

6.  The parties agree that Norbest had an accrual program while performing under its agreement with MFC and it is further agreed by the parties that the agreement did not allow for an accrual program;

7.  The proceeds of the Norbest accrual program went to pay for marketing and, what was left over, accrued to the benefit of MFC or was returned to MFC in cash;

8.  MFC and its officers were not directly apprised of the Norbest accrual program and we do not impute the Norbest employees' knowledge of the accrual program to MFC or its officers;

9.  In early 2005 MFC president David Bailey and WLF president Ed Garrett commenced discussions to have the two companies enter into a business relationship including a marketing alliance (Ex. 68 and Ex. 69);

10. David Bailey advised Ed Garrett and the employees of Norbest that personnel of WLF would be given access to all books, accounting software and employee information so that WLF would have adequate information to negotiate future agreements with MFC;

11. During the due diligence process with Norbest, Ed Garrett and other WLF employees became aware of the accrual program run by Norbest. Ed Garrett was aware the program was not authorized under the agreement between MFC and Norbest but he wanted the accrual program continued if WLF was to take over the marketing;

12. While negotiations were ongoing, WLF entered into a Turkey Breast Agreement (Ex. 42) with Norbest whereby Norbest was to deliver to WLF 4,000,000 pounds of turkey breast at $1.55 per pound starting January 1, 2006, and ending December 31, 2006. All parties, including MFC, were aware that the turkey breasts would be coming from MFC. (See Section on counterclaims for further matters dealing with the Turkey Breast Agreement);

13. Ed Garrett, on behalf of WLF, and David Bailey, on behalf of MFC, exchanged various drafts of a proposed marketing agreement (See Ex.'s 143-148). On the original drafts, paragraph 4 provided that "West Liberty agrees to remit weekly to Moroni the gross sales price of the previous week's sales after deducting the following offsets." WLF employees were not satisfied with the "gross sales price" language because it would not permit an accrual program, so after internal communications, Garrett countered with a draft agreement which changed "gross sales price" to "invoiced plant sales price." Upon receiving this draft, David Bailey noted the change in language and put a circle around the new and old language and noted "vs" on the draft (Ex. 147);

14. David Bailey did not believe the "invoiced plant sales price" meant anything but gross price so he was not concerned with the change. At no time did Ed Garrett advise David Bailey or anyone at MFC that he wanted language in the Marketing Agreement that would allow for an accrual program that was similar to the one operated by Norbest when it was the exclusive agent for MFC;

15. The term "invoiced plant sales price" has no specific trade meaning within the food industry;

16. The Marketing Agreement (Ex. 20) was signed on May 1, 2006, and it contained the language that "Western Sales (WLF) agrees to remit to Moroni the amount of the invoiced plant sales price of the sales from the week prior to the week in which payment is made, after deducting the following offsets";

17. The Marketing Agreement contains the following relevant provisions:

1. Exclusive Agent to Market.  Moroni hereby appoints and designates Western Sales (WLF) as its exclusive agent in the sales and marketing of all turkeys and turkey products…

3. Transfer of Title.  Title to Products processed by Moroni and risk of loss with respect to the Products shall remain in Moroni until said Products arrive at the dock of a customer of Western Sales (WLF)…

4. Authorization to Sell:  Marketing Fees:  Moroni hereby authorizes Western Sales (WLF) to sell Products in Western Sale's own name, brands and labels or in such other names…

25. Entire Agreement: Modification: Waiver.  This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes any prior and Extemporaneous agreement, representations, and understanding of the parties.  No representation by either party other than those contained herein have been relied on by the parties.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the parties…

18. The Agreement (Ex. 20) is a wholly integrated contract as that term is defined by the Utah Supreme Court in <u>Tangren Family Trust v. Tangren</u> (2008), 182 P. 3d 326.

19. From the inception of the Agreement in 2006 until MFC terminated the Agreement in 2010, WLF operated two types of accrual funds. The first type consisted of rebates to its customers which were requested by the customers. The second type of accrual consisted of funds generated by WLF upcharging the sales price on certain customer invoices. WLF would then submit a second weekly invoice to MFC, pursuant to paragraph 4 of the Agreement, which would not reflect any upcharges to the customer, if any, but rather the "plant" charge – i.e., the sales price Moroni agreed that its products could be sold at. WLF would retain the upcharged amounts for purposes of managing the MFC accounts and retaining the profits in its general funds. The retained accrual profit was in addition to the marketing fees it earned under the Agreement.

20. MFC was generally aware of the customer rebate accrual funds but not the upcharge accrual funds. The upcharge accrual funds generated close to two million dollars per year from 2006-2009.

B. CONCLUSIONS OF LAW

Claimant asserts that the Agreement (Ex. 20) is a wholly integrated document which is clear and unambiguous if it is reviewed within the four corners of the document. Claimant also asserts that the clear and unambiguous meaning of "invoiced plant sale price" can mean nothing more than gross sales price. And, if the contract is interpreted to require WLF to remit to MFC the gross sales prices it received on the upcharge invoices, WLF owes MFC over four million dollars in damages.

Respondent asserts that the document is not clear and unambiguous and if the Panel considers all of the extrinsic evidence submitted, it will come to the conclusion that "invoiced plant sale price" means the price shown on the invoice submitted to MFC, which was the price MFC agreed that its products were to be sold at – not the price invoiced to the customer. Thus, Respondent asserts that the upcharge accruals are authorized under the Agreement and it owes MFC nothing.

The Utah Supreme Court[2] in <u>Tangren Family Trust v. Tangren</u> (2008), 182 P. 3d 326, held at Paragraph 11:

> "Thus, if a contract is integrated, parol evidence is admissible only to clarify ambiguous terms; it is not admissible to vary or contradict the clear and unambiguous terms of the contract. The application of the parol evidence rule is therefore a two-step process: First, the court must determine whether the agreement is integrated. If the court finds the agreement is integrated, then parol evidence may be admitted only if the court makes a subsequent determination that the language of the agreement is ambiguous."

The Panel has previously held, in its Findings of Fact, that the Agreement is wholly integrated. The question now remains whether, reviewing the language within the four corners of the Agreement, it can be determined what the intent of the Parties was in their use of the term "invoiced plant sale price." There was no testimony that this term has a special meaning within the industry. The arrangement between the Parties clearly does not amount to a retailer-wholesaler agreement whereby WLF would purchase the inventory from MFC and then resell it in its own name to its (WLF) customers at any price it so desired. (See Paragraph 1 wherein WLF is an agent of WLF in the sale and marketing of its (MFC) product.) Title did not transfer to WLF. Title remained in MFC

---

[2] The arbitration clause provides that Utah law prevails in the interpretation of the Agreement.

until the product was delivered to the customers. (Paragraph 3). WLF was to be compensated by agreed upon marketing fees. (Paragraph 4 and Exhibit B to Marketing Agreement). Advertising and promotion costs were items WLF was required to pay at its cost. (Paragraph 1 and Exhibit A to Marketing Agreement) Finally, the Agreement provides that while WLF has the final say so regarding most marketing matters, MFC is to be consulted on matters of price, procedures, product mix, product development and customer profiling. (Paragraph 1)

Construing the provisions together, it appears that the document provides for a marketing agency relationship whereby WLF's only fees are the offsets provided in Paragraph 4 and the Exhibits attached thereto. Accordingly, the Panel finds that the term "invoiced plant sale price" means the sales price invoiced to the customer and that, within the four corners of the contract, that term is clear and unambiguous. Nonetheless, the Panel has reviewed all of the extrinsic evidence relating to the definition and meaning of the term "invoiced plant sales price" including: (1) What, if any, prior knowledge MFC had regarding Norbest's accrual program; (2) information Norbest employees had that could have been imputed to MFC; (3) the information contained in Norbest computer software (Norlink); (4) the various drafts of the Agreement; (5) the prior agreements between the Parties; and, (6) the information obtained by its attorney, Steve Johnson. Even when considering this extrinsic evidence, the Panel cannot conclude that the term has a different meaning than it has within the four corners of the Agreement, that being sales prices invoiced to customers.

## C. MORONI'S DAMAGES ON CONTRACT CLAIM

Chesley Erickson, Moroni's Damage Expert and C.P.A., calculated Moroni's loss as $4,648,585. This calculation was distilled from the total amount of accrual funds ($8,024,971.45) generated during the determined term of the Marketing Agreement.

Erickson arrived at Moroni's damages amount after subtracting out those accrual funds generated by sales of Nebraska Turkey Grower's products and amounts that were determined to be customer rebates. Further, Erickson deducted allowable WLF expenses relating to freight, quality and pricing issues.

The original Damages estimate provided by Erickson is adopted with one adjustment. An additional post-hearing calculation was done by Erickson to determine what additional allowable deductions were justified by his 588 source document sample.[3] The damages calculated by Erickson are supported by the evidence, reasonable and justified. Moroni is therefore awarded $4,533,407 as compensatory damages.

### III. MFC'S ADDITIONAL CLAIMS

MFC asserts several claims in addition to its breach of contract claim: (1) breach of implied covenant of good faith and fair dealing; (2) breach of a fiduciary duty; (3) fraudulent concealment; (4) conversion; (5) fraud; (6) unjust enrichment; and (7) violation of the Utah Livestock Dealers Act, Utah Code Ann. 4-7-1 et. Seq.

The panel has determined that WLF breached the Marketing Agreement and has awarded damages for the breach. Most of MFC's additional claims seek the same damages on the breach of contract claim. Thus, findings under additional claims that seek damages identical to the breach of contract claim are superfluous. Thus, the claims for breach of implied covenant of good faith and fair dealing, conversion and unjust enrichment are moot. With respect to the claims of breach of fiduciary duty,

---

[3] At the hearing, Erickson was questioned about the allowable deductions and acknowledged that he had not extrapolated the allowable deductions discerned from his 588 item sample, to his larger Universe of "other GL items" and "Unclassified AP." He told the Panel that he would do the additional calculation post-hearing. The information was provided in Moroni's Post-Hearing Brief and set forth in Exhibit G.

fraudulent concealment and fraud, claimant is seeking compensatory damages, which have been awarded.

Further, turning to the merits of the tort claims, the panel makes the following findings.

The Utah Supreme Court recently held in Reighard vs. Yates 285 P.3d 1168 (Utah 2012) at para. 12-22:

> "The economic loss rule prevents recovery of economic damages in tort when a contract covers the subject matter of the dispute…the economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care…. Under such circumstances, the contract is the exclusive means of obtaining economic recovery. This result is compelled because a contract may alter or eliminate common law tort duties…the contractual relationship controls, and the parties are not permitted to assert actions in tort in an attempt to circumvent the bargain they agreed upon…. Whether the economic loss rule applies depends on 'whether a duty exists independent of any contractual obligation between the parties…. All contract duties, and all breaches of the duties…must be enforced pursuant to contract law."

[emphasis added]

MFC's claims for breach of fiduciary duty, fraud and fraudulent concealment emanate from the alleged duty of WLF to pay to MFC the invoiced price to the customers. MFC asserts that the economic loss rule does not preclude the independent claim of the breach of fiduciary duty and/or fraud even though the claims emanate from the contractual obligations. The panel disagrees. MFC claims WLF fraudulently

concealed information relevant to the invoiced price. This issue is not a concealment issue; it is a contract interpretation issue with each Party arguing that its interpretation is controlling. Because we find there was a genuine issue of contract interpretation, MFC cannot prove by clear and convincing evidence there was a legal duty for WLF to communicate the invoice information to MFC. (See <u>Jensen vs. IHC Hospitals, Inc.</u> 82 P.3d 1076, (Utah 2003), and <u>Anderson vs. Kaiser</u>, 266 P.3d 819 (Utah 2011).

With respect to the claim that WLF breached its fiduciary relationship under the contract, the panel again believes the economic loss rule applies and, the conduct does not rise to the level of punitive damage activity. While the contract creates an exclusive marketing agency relationship (Ex. 20 Sec. 1), it does not by its terminology create a fiduciary relationship. (See Sec. 24, "The parties hereto are independent contractors...") In a case cited by MFC, the Utah Supreme Court in <u>Hal Taylor Assoc. vs. Union America, Inc.</u> 657 P.3d 743 (Utah 1982) held at p. 749:

> "A fiduciary duty or confidential relationship may be created by contract or by circumstances where equity will imply a higher duty in a relationship because the trusting party has been induced to relax the care and vigilance he would ordinarily exercise. In such a case, the evidence must demonstrate the placement of trust and reliance such that the nature of the relationship is clear."

The Court in <u>Hal Taylor Assoc.</u>, *supra* concluded that the evidence was insufficient to create a fiduciary relationship between a real estate broker and the land owner. The Court specifically found at p. 749 of 657 P.3d:

12

"Neither do we find that the language of the Settlement Agreement or Listing Agreement created any extraordinary duty to HTA beyond the ordinary duty of good faith in the performance of contracts."

The panel finds that the Marketing Agreement creates duties upon the parties as set forth in the Agreement and nowhere in the agreement are there any extraordinary duties created which would give rise to a contractual and/or legal finding of a fiduciary duty on behalf of WLF toward MFC.

Moreover, as to MFC's request that it be awarded punitive damages for WLF's engagement in "tortious conduct," we note that under Utah statutes, punitive damages may be awarded only if clear and convincing evidence establishes that the acts of omissions of a tortfeasor are the result of "willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference found, and a disregard of the rights of others." U.C.A. Sec. 78B-8-201(1)(a). Over and above the issue of the substantive merits of the tort claims, a review of all the evidence does not support a conclusion that the clear and convincing standard set forth by Utah law is met and therefore MFC's request for punitive damages is denied.

Finally, in addition to the above claims, MFC argues that the Utah Livestock Dealer's Act, Utah Code 4-7-1 was breached by WLF. The panel finds that even though the Act was amended in 2011, the Act in effect at the time the contract was in effect is controlling in this case (the 2006 Act).

In Utah Code 4-7-2, the legislature provides:

"Purpose declaration.

The Legislature finds and declares that the public interest requires regulation of the sale of livestock between the producer and persons who purchase livestock.

13

Section 4-7-3(3)(a) defines "dealer" as a person who:

"receives livestock from a person for sale."

Section 4-7-3(7) defines a "producer" as :

"a person who is primarily engaged in the business of raising livestock for profit."

Section 4-7-14 sets forth "prohibited acts" which MFC asserts were violated by WLF's breach of the Marketing Agreement as set forth herein.  WLF argues that turkeys are not "livestock" under the Act and WLF was not a "dealer".  The panel finds that MFC has provided no evidence or legal authority to support its proposition that turkeys are livestock under the Act.  In addition, since WLF never received the product (it was shipped directly from MFC to customers and no title passed to WLF) it was not a "dealer".  The panel finds that the Utah Livestock Dealer's Act is inapplicable to the case.

## IV.  WLF'S COUNTERCLAIM NO. 1

WLF seeks damages against MFC for breach of the Marketing Agreement (Ex. 20) by failing to deliver product thereunder in good marketable condition at the times and places directed and by failing to process the product in accordance with USDA standards and specifications.  WLF is seeking damages in the amount of $462,671.82.

The record does not reflect that during the course of the agreement WLF routinely brought to the attention of MFC that it had delivered non-marketable turkey breast.  Nor was evidence presented that MFC was given the opportunity to inspect the goods to determine whether it was marketable or not.  WLF "covered" the losses internally by the use of accrual funds and did not notify MFC that it was doing so.  At the hearing WFC provided the panel with figures dealing with this counterclaim but provided no evidence that the losses were justified on the date they allegedly took place.  In addition, MFC's Expert witness, Chesley Erickson, took WLF's verifiable losses into

14

account in computing the damages MFC incurred as a result of WLF's breach of the Marketing Agreement. (Ex. 123)

The panel finds that the evidence submitted does not support a claim against MFC on the Marketing Agreement.

## V. WLF'S COUNTERCLAIM NO. 2

This counterclaim has been withdrawn by Respondent.

## VI. WLF'S COUNTERCLAIM NO. 3

WLF claims that MFC breached its obligations under the Turkey Breast Agreement. (Ex. 42) [4] The Turkey Breast Agreement was entered into on August 25, 2005, between WLF and Norbest. At the time the Turkey Breast Agreement was executed, Norbest and MFC were operating under a Membership Marketing Agreement. (See Ex. 200) Paragraphs 4 and 7 of the Membership Marketing provide, in part, as follows:

> "4. Exclusive Agent to Market. Member hereby appoints and designates Norbest as its Exclusive agent for it in the sale and marketing of all turkeys and turkey products, in any form..."
> 7. Authorization to Sell: Marketing Fees. Member hereby authorizes Norbest to sell Products in Norbest's own name, brands and labels and to pass title to said Products to whom, at such time or times, at such place or places, and in such manner as determined by Norbest and its customers."...

The Turkey Breast Agreement was entered into by Norbest and WLF while WLF and MFC were considering various forms of business relationships including a marketing alliance. (See Confidential Agreement of May 24, 2005, referred to in the Letter of Intent. Ex. 68 and Ex. 69) Under the Turkey Breast Agreement: "(4) Norbest shall sell

---

[4] The Turkey Breast Agreement does not contain an arbitration clause however the parties, in their post-hearing briefs, have agreed not to object to the jurisdiction of the panel to resolve this counterclaim.

to WLF a minimum of four million (4,000,000) pounds of Product during the term of this Agreement....; (5) Norbest shall deliver two (2) loads of Product to WLF per week during the period beginning on January 1, 2006, and continuing [through December 30, 2006]...; (6) The price for the Product shall be one dollar and fifty-five cents per pound ($1.55), F.O.B. Norbest's plant." The Turkey Breast Agreement was signed by David Bailey as President of Norbest, Inc. (while at the same time he was President/CEO of MFC). Bailey was aware when he signed the agreement that MFC would be providing the turkey breast contracted for under the agreement. It is clear from all of the evidence that Norbest, MFC and WLF knew at the time the agreement was signed that Norbest was the exclusive marketing agent for MFC; MFC was the entity that was to deliver the product under the agreement; MFC knew that Norbest had entered into the agreement which in essence required MFC to deliver four million pounds of turkey breast to WLF during 2006; MFC was to receive the benefit of the agreement ($1.55 per pound); and, MFC never objected to the agreement when it was signed and put in effect January 1, 2006. It appears that MFC sold approximately one load of breast meat per week to WLF from May through the end of 2006 and through 2007. MFC argues that these sales were not done pursuant to the agreement but only because WLF requested MFC to give it all that it could. (See p. 75 MFC Post Hearing Brief)

In early 2006, when MFC was to provide Norbest with the turkeys to fulfill the agreement, it had significant issues trying to deliver the turkey breast promised under the agreement that it believed it was responsible to perform. (See Moroni Board Minutes, January 15, 2006; Ex. 113: Olson Deposition Testimony at pp. 21-23; Olson Hrg. Testimony 215-216). The parties agree that Ed Garrett addressed Dave Bailey as President of MFC (not Norbest) that WLF was aware that MFC was having difficulties fulfilling the agreement so Ed Garrett in January 2006 advised Dave Bailey to not short its customers and to give WLF what MFC could deliver. Moroni requested a delay in the

delivery schedule that WLF granted. (Ex. 515) The panel finds that WLF's proposal of a deferral of delivery was not a release of MFC of its duty to deliver turkey breasts under the agreement.  At no time did MFC ever advise WLF that it was not a party to the agreement nor did MFC ever advise WLF that it was not bound on the agreement to deliver any turkey breasts, much less four million pounds over a one-year period.

WLF asserts that MFC ratified the agreement that its agent (Norbest) entered into and is thus liable on the agreement that Norbest breached. MFC argues that it was not a party to the agreement; it did not ratify the agreement; and, even if it did ratify the agreement, WLF released it from its performance responsibilities.

> "Performance of a contract, permission to the party with whom the corporation contracts to perform, the acceptance of the performance on the fruits of the performance by the corporation, acquiescence in the contract, payment to the other party and the like, all operate as acts of ratification."

[In Re: *Johnson's Estate Andrew Superintendent et al. v. Johnson's Estate, et al, 210 Iowa 891.  232 N.W. 282, 287, Iowa Sup Ct. 1930*][5]

The Supreme Court of Iowa further held:

> "Ratification operates upon the act ratified precisely as though authority to do the act had been previously given; and, when the principal has ratified the unauthorized agreement of an agent, an action may be brought upon the agreement as though originally made by due authority.  In substantiation of the principles announced, we made some quotations from the cited cases.  In *Long v. Osborn*, 91 Iowa, 160, 59 N.W. 14, this court declared:  "It is the general rule that the adoption by a principal of the unauthorized acts of an agent goes back to the inception of the transaction, and continues to its end.  *Eadie v. Ashbaugh*, 44 Iowa, 520; *Mechem. Ag.* §167; 1 Am. & Eng. Enc. Law, 429.  'The ratification operates upon the act ratified precisely as though authority to do the act had been previously given, Except when the rights of third parties have intervened between the act and the ratification.'  *Cook v. Tullis*, 18 Wall. 332 [21 L. Ed. 933].  We are of the opinion that, when the unauthorized agreement of an agent has been ratified by his principal, an action may be brought thereon, as though originally made by due authority, and that it is not necessary, in the first instance, to allege in the pleading the ratification, but that it may be shown in proof of the agreement."

[In Re: *Johnson's Estate, supra* at p. 286 of 232. N.W.]

---

[5] The contract provides that Iowa law controls (Sec. 12(b))

See also *Central States Industrial Supply, Inc., et al. v. Steve McCullough*, 279 F. Supp2d. 1005 (DC ND Iowa, 2003) adopting the Iowa Supreme Court's decision in In Re: *Johnson' Estate*.

Restatement (3d) of Agency Section 4.01 defines ratification as follows:

(1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.

(2) A person ratifies an act by

    a. Manifesting assent that the act shall affect the person's legal relations, or

    b. Conduct that justifies a reasonable assumption that the person so consents.

(3) Ratification does not occur unless

    a. The act is ratifiable as stated in § 4.03,

    b. The person ratifying has capacity as stated in § 4.04,

    c. The ratification is timely as stated in § 4.05, and

    d. The ratification encompasses the act in its entirety as stated in § 4.07."

Comment d of Section 4.01 provides

"Actions that constitute ratification. Ratification requires an objectively or Externally observable indication that a person consents that another's prior act shall affect the person's legal agent. This is so because the focal point of ratification is an observable indication that the principal has Exercised choice and has consented. In contrast, the principal's manifestation of assent to the agent is essential to the presence of actual authority, (see §§ 2.01 and 3.01) and the principal's manifestation to the third party is essential to the presence of apparent authority (see §§ 2.03 and 3.03).
Conduct demonstrates consent to becoming subject to the legal consequences of another's act in the two situations stated in subsection (2). First, a person may ratify an act by manifesting assent that the act affects the person's legal relations. Second, the person may ratify the act through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences. For Example, knowing acceptance of the benefit of a transaction ratifies the act of

entering into the transaction. This is so even though the person also manifests dissent to becoming bound by the act's legal consequences."

The panel finds that MFC was aware of the agreement as soon as it was entered into. MFC was aware of its responsibilities and benefits under the agreement and manifested consent to be bound by the agreement. (See Ex. 105) As provided in *In Re: Johnson's Estate*, *supra*, ratification goes back to the inception of the agreement. (August 25, 2005). Thus, MFC's subsequent difficulties to perform under the agreement do not render its ratification a nullity.

The panel further finds that (1) MFC's ratification is not subject to the statute of frauds set forth in I.C.A. Sec. 554.2201; (2) WLF's assumption of Norbest's agreement with customers set forth in Ex. 71 does not preclude it from recovering on the agreement; and, (3) WLF did not release MFC from its responsibilities to deliver 4,000,000 pounds of turkey breast in the year 2006. The evidence submitted by MFC of Ed Garrett permitting a deferral of delivery until after May does not rise to the level of proof by a preponderance that WLF intended (with consideration) to release MFC of its obligations on the agreement, but rather to allow MFC to delay its performance to later in 2006.


## VII. WLF'S DAMAGES

MFC asserts that the Iowa UCC (I.C.A. See 554.2711(1)(a) requires WLF to cover before it can recover on the Turkey Breast Agreement. The Iowa UCC gives an aggrieved party the option to cover but does not require it to do so. (See I.C.A. Sec. 554.2719(1)(b)). MFC also asserts that paragraph 11 of the Turkey Breast Agreement requires it to cover. Paragraph 11 provides: "If Norbest fails to deliver Product as provided herein, or if Norbest fails to perform any other provisions of this agreement in accordance with its terms, then

WLF <u>may</u> procure the Product from other sources...." (emphasis added)  Clearly this provision does not require WLF to cover, it permits it to cover and recover damages if it chooses to do so.

WLF provided unrebutted evidence of the market price of turkey breast at the time MFC was to deliver the breast.  It is unrebutted that Urner Barry is an acceptable method of determining the market price of turkey breast at a given time.  MFC delivered 984,109 pounds of turkey breasts out of a contracted-for 4,000,000 pounds. The panel finds that the appropriate measure of damages is the difference between the contracted price ($1.55) per pound and the market price at the time of delivery – Urner Barry.  Further, the panel has determined that the spread out over twelve month calculation of damages set forth in Ex. 514 is the appropriate calculation of damages.  ($1,531,427.41).  The calculation set forth in Ex. 41 ($2,628,629.64), and sought by WLF, is rejected by the panel.

Finally, the panel finds that pre-judgment interest on $1,531,427.41 is appropriate under Iowa Statutes from January 1, 2007, to the date of this decision.  It is the panel's understanding that Iowa's pre- and post-judgment interest rate is 5% (I.C.A. Sec. 535.20).

## VIII.  COST, EXPENSES, AND ATTORNEY'S FEES

Neither the Marketing Agreement nor the AAA rules require that attorney's fees, costs or expenses be awarded to a prevailing party.  The Marketing Agreement states: "The arbitrators(s) may award to the prevailing party any costs and expenses arising out of or caused by the arbitration, together with a reasonable attorney's fee expended or incurred by it." (Paragraph 17)  Similarly, AAA Commercial Rule 43 gives arbitrators the discretion to award attorney's fees and other relief that is deemed "just and equitable."

In accordance with this grant of discretion, the Panel denies all requests for costs, attorney's fees and expenses.

## IX.  CONCLUSION

A.  Based upon the evidence and contracting law, the panel concludes:

1.  Moroni is awarded $4,533,407 on its breach of contract claim.

2.  Moroni's additional claims are denied.

3.  Moroni is awarded pre-judgment interest at the Utah statutory rate of 10%, determined on a yearly basis as set forth in Exhibit G, Schedule C of MFC's Post-hearing Brief up until the date of this Interim Award.

4.  West Liberty is awarded $1,531,427.41 on its breach of turkey breast agreement counter-claim.

5.  West Liberty's other counter-claim relating to the Marketing Agreement is denied.

6.  West Liberty is awarded pre-judgment interest at the maximum Iowa statutory rate as calculated from January 1, 2007, until the date of this Interim Award.

7.  The Parties' requests for awards of costs, expenses and fees are denied.

8.  Both Parties are awarded post-judgment interest at the rates allowed under the applicable state statutes.

The Parties shall confer and reach agreement as to the allowed pre-judgment interest as of the date of this Interim Award, and submit their agreed upon calculations to AAA within 10 working days.  Upon receipt of the agreed upon calculations a Final Award will issue.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

6/27/13
_____
Date

So ordered:
_____
Dale A. Crawford

_____
Date

_____
Hon. Kathleen A. Blatz

22

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

So ordered.

_____
Date

_____
Dale A. Crawford

_____
Date

_____
Hon. Kathleen A. Blatz

22

## Stanley Preston

| | |
|---|---|
| **From:** | Stanley Preston |
| **Sent:** | Friday, July 12, 2013 9:36 AM |
| **To:** | alysondiblasi@adr.org |
| **Cc:** | rsbrandt@tntlaw.net; kathleenblatz@msn.com; judgedac@sbcglobal.net; tank.dave@dorsey.com; Dralle.Angela@dorsey.com; Bryan M. Scott; Brandon Crowther |
| **Subject:** | RE: 58 467 30 12 MFC v. West Liberty Foods, et al., (Joint Submission) |

*Dear Panel Members:*

*At page 21 of the "interim award" entered on June 27th, 2013, the panel directed the parties as follows:*

*"The Parties shall confer and reach agreement as to the allowed pre-judgment interest as of the date of this Interim Award, and submit their agreed upon calculations to AAA within 10 working days. Upon receipt of the agreed upon calculations a Final Award will issue."*

*Pursuant to the direction given above, the parties have conferred and agree as follows:*

- *The panel has awarded damages to MFC in the total amount of $4,533,406.71. The parties agree that the amount of pre-judgment interest on this damage award, calculated at a rate of 10% per year, equals $2,152,619.93 as of June 27, 2013, the date of the "Interim Award".*

- *The panel has awarded damages to WLF in the total amount of $1,531,427.41. The parties agree that the amount of pre-judgment interest on this damage award, calculated at a rate of 5% per year, equals $496,765.60 as of June 27, 2013, the date of the "Interim Award".*

*The parties also agree that the post-judgment interest rate is 2.15% under Utah law and 2.12% under Iowa law.*

*Very Sincerely,*

*Moroni Feed Company,*

  *by /s/ Stanley J. Preston*

*West Liberty Foods,*

  *by /s/ David A. Tank*

Stanley J. Preston
PRESTON & SCOTT
Five Gateway Office Center
178 S. Rio Grande St., Suite 250
SLC, UT 84101
Tel.: 801-869-1620
Fax: 801-869-1621
DD: 801-869-1623
sjp@prestonandscott.com


EXHIBIT
D

1

The information contained in this e-mail and any attachments is confidential and solely for the use of the intended recipient.  If the intended recipient is our client, then this information is also a privileged attorney-client communication.  Unauthorized use or disclosure of this information is prohibited.  If you have received this communication in error, do not read it.  Please delete it from your system without copying it, and notify the sender by e-mail or by calling 801-869-1620, so that our address record can be corrected.  Thank you.